·SINGER, RESPONDENT, *v.* MISSOULA STREET RAILWAY CO. ET AL., APPELLANTS.

(No. 3,234.)

(Submitted March 19, 1913.   Decided April 7, 1913.)

[131 Pac. 630.].

*Personal Injuries—Street Railroads—Rights of Travelers on Bridges — Contributory Negligence — Last Clear Chance — Negligence—Jury Question.*

Personal Injuries—Street Railroads—Rights of Travelers on Bridges—Contributory Negligence.
1.   *Obiter:* A traveler in attempting to cross a bridge while riding a horse which, though up to that time gentle and accustomed to street-cars, became restive and unmanageable at the approach of a car, or in failing to retire therefrom, did not thereby become a trespasser upon the right of way of the railway company over the bridge, nor lay himself open to the charge of being guilty of contributory negligence as a matter of law.

Same—Last Clear Chance—Negligence of Motorman Jury Question.
2.   Upon the assumption that plaintiff, in going upon the bridge on horseback under the conditions set forth in paragraph 1 *supra,* was guilty of negligence, and that the facts made the doctrine of the last clear chance applicable, evidence *held* to have made out a case for the jury upon the question whether the motorman in charge of the car in colliding with which plaintiff was injured, took such precautions as he should have taken to avoid injury to the latter, after he discovered his perilous position.

*Appeal from District Court, Missoula County; F. C. Webster, Judge.*

ACTION by George Singer against the Missoula Street Railway Company and one of its motormen.   From a judgment for plaintiff, defendants appeal.   Affirmed.

*Messrs. W. M. Bickford, V. S. Kutchin, and Wm. F. Wayne* submitted a brief in behalf of Appellants; *Mr. Wayne* argued the cause orally.

Respondent was guilty of gross initial negligence in the following respects: (1) In attempting to ride his horse across the bridge knowing the likelihood of meeting street-cars thereon, without adequate equipment with which to control him.   (2) In that he refused to take advantage of the opportunity presented

to him during the entire time elapsing from the moment when the car came into view to the moment of the collision (a distance of some 300 feet), to turn the animal about, or permit him to turn about as he was making every effort to do, and proceed northward off of the bridge and to a place of safety. The law required of him the exercise of reasonable care for his own safety and presumed that he would exercise it. (Rev. Codes, sec. 7962, subd. 4; *Monson* v. *La France Copper Co.,* 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243.) ''The duty of guarding an individual against injury which the law imposes upon a railroad company is no higher or greater than that which the individual owes to care for his own safety.'' (*Southern Ry. Co.* v. *Bailey,* 110 Va. 833, 67 S. E. 365.) The burden of proof was upon respondent, as soon as his negligence was developed in his own evidence, to exonerate himself from the effect thereof by a fair preponderance of the evidence. He chose to take the position that, conceding his negligence, appellants had a last clear chance to avoid the injury by the exercise of ordinary care. The burden of proof was thus upon him to prove (1) that his position of peril was discovered by appellants (*San Antonio Traction Co.* v. *Kelleher,* 48 Tex. Civ. App. 421, 107 S. W. 64); (2) ability of appellants to avoid the accident by the exercise of ordinary care (*Plinkiewisch* v. *Portland Ry. etc. Co.,* 58 Or. 499, 115 Pac. 151; *Trigg* v. *Water etc. Transit Co.,* 215 Mo. 521, 20 L. R. A., n. s., 987, 114 S. W. 972; *Butler* v. *Rockland etc. Ry. Co.,* 99 Me. 149, 105 Am. St. Rep. 267, 58 Atl. 775); and there was no proof introduced by him, either in chief or in rebuttal, upon either of these matters.

The doctrine of the last clear chance presupposes (1) initial or contributory negligence of the person injured; (2) a perilous or dangerous position of the person injured created by such negligence; (3) discovery of this position by the person sought to be charged; and (4) new or primary negligence of the person sought to be charged subsequent to the negligence of the person injured, of such a character that without it the injury would not have occurred. It is the doctrine of discovered peril. The theory upon which it proceeds is that the initial or contributory

fault of the person injured has created a new condition, which is discovered by the person sought to be charged, and that subsequent to the discovery of this condition, the person sought to be charged has had a fair opportunity to avoid the injury by the exercise of ordinary care and has failed to do so. (*Hall* v. *Missouri etc. R. Co.*, 219 Mo. 553, 118 S. W. 56.) The plaintiff must show that at some point of time in view of the entire situation, including plaintiff's negligence, the defendant was thereafter culpably negligent and its negligence the latest in the succession of causes. (*Butler* v. *Rockland etc. Ry. Co.*, 99 Me. 149, 105 Am. St. Rep. 267, 58 Atl. 775; *Southern Ry. Co.* v. *Bailey*, 110 Va. 833, 67 S. E. 365; *Gumm* v. *Kansas etc. Ry. Co.*, 141 Mo. App. 306, 125 S. W. 796.)

The doctrine of the last clear chance does not apply where the peril of the person injured is not discovered, and could not by the exercise of ordinary care be discovered until too late to avoid the accident. (36 Cyc. 1568; *State* v. *Cumberland etc. Ry. Co.*, 106 Md. 529, 16 L. R. A., n. s., 297, 68 Atl. 197; *Laughlin* v. *St. Louis etc. Ry. Co.*, 144 Mo. App. 185, 129 S. W. 1006; *Rippetoe* v. *Feely*, 20 Idaho, 619, 119 Pac. 465; *Rissler* v. *St. Louis Transit Co.*, 113 Mo. App. 120, 87 S. W. 578; *San Antonio Traction Co.* v. *Kelleher*, 48 Tex. Civ. App. 421, 107 S. W. 64; 2 Thompson on Negligence, sec. 1629.)

Mere knowledge of the presence of the person injured without knowledge of his peril is not sufficient. (*Louisville Ry. Co.* v. *Colston*, 117 Ky. 804, 79 S. W. 243; *Rissler* v. *St. Louis Transit Co.*, 113 Mo. App. 120, 87 S. W. 578.) The doctrine can never apply when the negligence of the person injured continued up to the time of the injury, or, in other words, when both parties were contemporaneously and continuously negligent up to the time of the accident. (36 Cyc. 1567; *Sego* v. *Southern Pac. Co.*, 137 Cal. 405, 70 Pac. 279; *Everett* v. *Los Angeles etc. Ry. Co.*, 115 Cal. 105, 43 Pac. 207, at 210; *Tobin* v. *Omnibus Cable Co.*, 4 Cal. Unrep. 214, 34 Pac. 124; *Holmes* v. *South Pac. Coast Ry. Co.*, 97 Cal. 161, 31 Pac. 834; *Hager* v. *Southern Pac. Co.*, 98 Cal. 309, 33 Pac. 119; *Drown* v. *Northern Ohio Traction Co.*, 76 Ohio St. 234, 118 Am. St. Rep. 844, 10 L. R. A., n. s., 421, 81

N. E. 326; *Green* v. *Los Angeles Terminal Ry. Co.*, 143 Cal. 31,
101 Am. St. Rep. 68, 76 Pac. 719; *Gumm* v. *Kansas etc. Ry. Co.*,
141 Mo. App. 306, 125 S. W. 796; *Himmelwright* v. *Baker*, 82
Kan. 569, 109 Pac. 178; *Butler* v. *Rockland etc. Ry. Co.*, 99 Me.
149, 105 Am. St. Rep. 267, 58 Atl. 775; *Plinkiewisch* v. *Port-
land Ry. etc. Co.*, 58 Or. 499, 115 Pac. 151.)

The case of *Coughtry* v. *Willamette Ry. Co.*, 21 Or. 245, 27
Pac. 1031, was, in its facts, almost identical with our case: Plain-
tiff's driver was holding the team beside the track; when they
saw the street-car coming they became uneasy, and when it was
about 125 feet away one of the horses "danced" on to the track
and continued there until struck by the car; the car was not
going at its usual speed, but faster. It was held that there was
no evidence of negligence on defendant's part to support a ver-
dict for plaintiff.

*Mr. Harry H. Parsons,* for Respondent, submitted a brief.

It is not essential that appellants should have actually dis-
covered respondent's peril in order that they might be held liable
under the doctrine of the last clear chance. Actual knowledge
is not necessary. If in the exercise of ordinary care upon their
part they ought to have discovered his peril, that is sufficient.
(*Bogan* v. *Carolina Cent. R. Co.*, 129 N. C. 154, 55 L. R. A.
418, 39 S. E. 808; *Neary* v. *Northern Pac. R. Co.*, 37 Mont. 461,
19 L. R. A., n. s., 446, 97 Pac. 944; *Hammond* v. *Eads*, 32 Ind.
App. 249, 69 N. E. 555.) That the respondent was actually
in a position of peril cannot be controverted. As so showing
that his peril was actually discovered by appellants or that in
the exercise of due care on their part it ought to have been dis-
covered, we submit the following: Let us assume that the ap-
proximate cause of the collision was the frightened and un-
manageable condition of the horse, and that in the absence of
such condition the horse and the car would have passed each
other in safety. (*Citizens' St. Ry. Co.* v. *Damm*, 25 Ind. App.
511, 58 N. E. 564.) Confessedly the car ran from 90 to 120
feet past the point of collision. That fact alone has been re-

peatedly held sufficient to show negligence on the part of the motorman and lack of contributory negligence on the part of the plaintiff. (*Stevens* v. *Union Ry. Co.,* 75 App. Div. 602, 78 N. Y. Supp. 624, 176 N. Y. 607, 68 N. E. 1125; *Binns* v. *Brooklyn Heights Ry. Co.,* 89 App. Div. 359, 85 N. Y. Supp. 874; *Bremer* v. *Railway Co.,* 107 Minn. 326, 21 L. R. A., n. s., 887, 120 N. W. 382.) "Each party must act reasonably under the attending circumstances." (Baldwin on Railway Law, 417.) "The motorman is not bound to anticipate that a rider will turn from a position of safety alongside the track and ride in front of a car in such a way as to bring about a collision." (*Id.* 421.) And the plaintiff likewise had the right to assume that the motorman would exercise ordinary care and diligence to prevent an accident or collision of this character. (*Indianapolis St. Ry. Co.* v. *Schmidt,* 35 Ind. App. 202, 71 N. E. 663, 72 N. E. 478; *Bremer* v. *Railway Co.,* 107 Minn. 326, 21 L. R. A., n. s., 887, 120 N. W. 382.) "The motorman must be on the constant watch for teams or cyclists turning upon the track, and keep his car under such control as to be able to slacken speed or come to a stop, should their safety seem reasonably to demand it." (Baldwin on Railway Law, 421.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This is an action for damages for personal injuries sustained by the plaintiff in a collision with one of the electric cars of the defendant railway company upon Higgins avenue bridge, in the city of Missoula, on January 7, 1911. The defendant Miner was the motorman in charge of and operating the car at the time of the accident. The bridge extends across the Missoula river at the foot of Higgins avenue, connecting the city proper with South Missoula. It is 1,023.6 feet in length, and consists of a roadway, 28.90 feet in width, with a footway on either side separated from it by railings. A single car track, four feet in width, lies in the middle of the roadway. Allowing for the overhang of a car when passing over the track, there is left between it and the footway railing on either side a clearance for vehicles,

*etc.,* of 10.6 feet.    The south end of the bridge is 7.54 feet higher than the north end.    From the south the roadway ascends on a grade of about one per cent for a distance of 174 feet, and then descends on substantially the same grade to the north.    After a car passing in either direction reaches the highest point, the power is shut off, and it is allowed to drift down the incline, the motorman controlling the speed by means of air brakes. The plaintiff's home is in South Missoula.    On the day of the accident he started from Missoula to go to his home.    He was riding a heavy draught horse, weighing about 1,500 pounds, which had on it a light single harness with a blind bridle.    He did not have a saddle, but was using a piece of blanket instead. The different parts of the harness were so secured as not to interfere with the horse's movements.    When the plaintiff had reached a point on the bridge about 300 feet from the north end, he observed a car approaching from the opposite direction at a distance of about 300 feet.    At the sight of the car, and presumably owing to the noise created by its movement, the horse became restive and attempted to turn and run.    The plaintiff struggled to hold it under control, but was not able to subdue it.    The result was that it got between the rails as the car was about to pass, and was killed by collision therewith, the plaintiff being thrown to the roadway and seriously injured.

The substantive issue made by the pleadings was whether defendant motorman was guilty of negligence in failing to stop the car in time to avoid the collision, and this negligence was the proximate cause of the injury, the defendants alleging that plaintiff's own negligence was a contributing cause.    The jury found for the plaintiff and assessed his damages at the sum of $4,390.    The appeal is from the judgment.

The only question submitted for decision is whether there was any evidence justifying the submission of the case to the jury.    The instructions submitted to the jury are not in the record.    It is not, therefore, apparent what was the court's view of the rule of law applicable.    The theory of counsel for defendants, as presented in their brief, proceeds upon the assumption that the right of the railway company to the use of the

bridge is so far superior to that of another person that when a car is passing over it such other person must give to it the exclusive right of way, or be subject to the imputation of negligence, which will preclude a recovery for any injury which he may sustain from a collision or other accident, unless he can show that the operator of the car has discovered his presence and has failed, when a condition of peril has intervened, to use such means as are in his power to avoid the accident. They insist that the burden was upon the plaintiff to show (1) that his position of peril was discovered by the motorman, and (2) that the latter was able by the use of ordinary care to avoid the accident. In other words, the plaintiff, first by going upon [1] the bridge when a car was approaching him, and, second, by failing to retire from it when his horse became restive and unmanageable, put himself in the position of a trespasser upon the rights of the company, which, for this reason, owed him no duty other than to use ordinary care to avoid injuring him, after his position of peril was discovered. They thus invoke the rule of the last clear chance, and argue that there is no evidence tending to show, either that the motorman discovered the position of plaintiff, or that, if he did, he failed to use ordinary care to avoid the collision. Whether the rule is technically applicable to a case of this kind, we shall not undertake to determine. We do not think plaintiff was guilty of negligence, as a matter of law, either in going upon the bridge, or in remaining on it, though he saw a car approaching. But, accepting the theory of counsel as correct, we nevertheless think the evidence made a case for the jury. It may be summarized, in part, as follows:

The plaintiff had advanced from the north end of the bridge [2] a distance of 300 feet. The horse was a gentle work horse, accustomed to being on the streets when cars were passing. It began to exhibit fright when the car was at a distance of 300 feet away. Passengers upon the car noticed this fact. At that time it did not appear to be under plaintiff's control. It was then "prancing" back and forth across the track. From that point on there was no change in the speed of the car, the motor-

man making no effort to check or stop it. It proceeded at the same rate until it struck the horse. One witness, who was a passenger, stated: "I noticed at the time we were going fast across the bridge. * * * We went as fast as we go on Third street going out to the fort, * * * and on Third street they go as high as twenty and twenty-five miles an hour." This last statement was made by a witness who had theretofore been employed as a motorman by the defendant company. Another witness stated that the plaintiff tried to keep the horse off the track, but that it backed upon it two or three times, and plaintiff could not hold it. This witness testified: "I saw the motor-man at that time. He did not do anything at all until, I should say, ten seconds; then he threw the current off. He stood there practically paralyzed, it appeared to me, I should say for about ten seconds. I should not say how far the car had gone past the horse before he threw the current. As to my best judgment upon that, he may have gone thirty feet. Right after he hit the horse he stood still, my recollection is. After he had gone about thirty feet, he threw the handle round like that. At that time he was going at full speed. * * * In my opinion, there was not any lessening of speed from the time I first saw the car at the south end of the bridge until the time that it hit the horse." This witness observed the accident from the upper floor of a building at the north end of the bridge, 400 or 500 feet distant from the place of the accident, but had a clear view. He stated further that the car was 300 feet away when the horse began to be restive. "As the car drew nearer, the horse became more frightened. * * * The horse backed on the track two or three times, but Singer tried to keep him off. Singer could not hold him." A rule of the company requires cars to be moved over the bridge, when teams are upon it, at a speed not to exceed six miles an hour, and at such times the cars must be under complete control. At the time of the accident there were four teams upon the bridge.

The motorman in charge of the car stated that he was drifting at the rate of five or six miles an hour, without power; that he had the car under control; that under such circumstances a

car could be stopped in about forty feet or the length of the car; that he did not see the horse on the track at all; that he first saw it 300 or 400 feet away; that at a distance of thirty feet the horse began to dance toward the track; that he then used all the emergency appliances to bring the car to a stop; that the horse threw up its head and began to dance toward the track, and was struck by the corner of the car as it was about to pass; that he did not know of anything else he could have done to avoid the collision; that in observing the horse he supposed that when it got right to him it would do like lots of other horses and "shoot past" him. A car allowed to drift from the highest point of the bridge without restraint would go at the rate of twenty or twenty-five miles an hour when within 250 feet of the north end of the bridge. Sometimes, when the bridge was clear, the motorman would make up time in crossing. The car was of an improved pattern and fitted with the most approved appliances. The motorman in charge had had an experience of two months, having learned to operate a car within that time. The car struck the horse on the rump with force sufficient to turn it end for end, and threw it off the track into the roadway, killing it. The vestibule of the car was broken in. When the car was finally stopped, it was from 90 to 120 feet beyond the point of collision.

The evidence is voluminous. There is much conflict in the statements of the different witnesses as to the particulars of the incident; but the foregoing statement of it is sufficient to demonstrate that, upon the assumption that plaintiff negligently put himself in a position of peril and remained there, whereas by retreating from the bridge he could have avoided the accident and thus saved himself, there was presented a case for the jury upon the question whether the motorman took such precautions as he ought to avoid the collision, after he discovered plaintiff's perilous position. The facts bring the case clearly within the rule as applied by this court in *Neary* v. *Northern Pac. Ry. Co.,* 37 Mont. 461, 19 L. R. A., n. s., 446, 97 Pac. 944, and 41 Mont. 480, 110 Pac. 226. Of course, it was not incumbent upon the motorman to stop the car when he first observed the plaintiff

approaching from the north, or even when he observed that the horse was becoming unmanageable. It was nevertheless his duty, when he observed that the horse was likely to carry the plaintiff in front of the car, and therefore into a perilous position, immediately to take such precautions as he could to avoid a collision. The evidence justified a finding that he failed to do so.

The judgment is therefore affirmed.

*Affirmed.*

MR. JUSTICE HOLLOWAY and MR. JUSTICE SANNER concur.

